# Exhibit 1

 **CT Corporation**

**Service of Process Transmittal**
08/23/2021
CT Log Number 540117391

| | |
|---|---|
| **TO:** | Stephen Mahieu<br>Kraft Heinz Foods Company<br>200 E. RANDOLPH ST., 75TH FLOOR<br>CHICAGO, IL 60601 |
| **RE:** | **Process Served in Florida** |
| **FOR:** | Kraft Heinz Ingredients Corp.  (Domestic State: DE) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | SABA INTERNATIONAL CORPORATION, ETC., PLTF. vs. KRAFT HEINZ INGREDIENTS CORP., ETC., DFT. |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 2021019227CA01 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/23/2021 at 10:13 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/23/2021, Expected Purge Date: 08/28/2021<br><br>Image SOP<br><br>Email Notification,  Sabrina Hudson  sabrina.hudson@us.hjheinz.com<br><br>Email Notification,  Stephen Mahieu  stephen.mahieu@kraftheinz.com<br><br>Email Notification,  Isabelle Kountz  isabelle.kountz@kraftheinz.com<br><br>Email Notification,  Stephen Mahieu  stephen.mahieu@kraftheinz.com<br><br>Email Notification,  Nakesha Davis  nakesha.davis@kraftheinz.com<br><br>Email Notification,  Caroline Teichner  caroline.teichner@kraftheinz.com<br><br>Email Notification,  Courtney Ofosu  courtney.ofosu@kraftheinz.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324<br>866-331-2303<br>CentralTeam1@wolterskluwer.com |

 CT Corporation

**Service of Process Transmittal**
08/23/2021
CT Log Number 540117391

**TO:**     Stephen Mahieu
            Kraft Heinz Foods Company
            200 E. RANDOLPH ST., 75TH FLOOR
            CHICAGO, IL 60601

**RE:**     **Process Served in Florida**

**FOR:**    Kraft Heinz Ingredients Corp.  (Domestic State: DE)

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Mon, Aug 23, 2021

**Server Name:**             Fred Humphries

| Entity Served | KRAFT HEINZ INGREDIENTS CORP. |
|---|---|
| Case Number | 2021-019227-CA-01 |
| Jurisdiction | FL |



Filing # 132779862 E-Filed 08/16/2021 04:56:42 PM

☑ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | **CASE NUMBER**<br>2021-019227-CA-01 |
|---|---|---|
| **PLAINTIFF(S)**<br>SABA INTERNATIONAL<br>CORPORATION, a Florida profit<br>corporation, | **VS.   DEFENDANT(S)**<br>KRAFT HEINZ INGREDIENTS CORP.,<br>a foreign profit corporation, | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s):     KRAFT HEINZ INGREDIENTS CORP., a foreign profit corporation

by serving its Registered Agent: C T Corporation System

1200 South Pine Island Road Plantation, FL 33324

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's

Attorney:     John E. Wilking, Esq.     Florida Bar No. 71167

whose address is:     9700 South Dixie Hwy, Penthouse 1100, Miami, Florida 33156

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br>**CLERK of COURTS** | 217043<br>*[signature]*<br>DEPUTY CLERK | DATE<br>8/17/2021 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314 Rev. 09/19

Clerk's web address: www.miami-dadeclerk.com

Fred Humphries
sps 824
2021-08-23 16:13:16

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

SABA INTERNATIONAL CORPORATION,       Case No.:
a Florida profit corporation,

      *Plaintiff,*

v.

KRAFT HEINZ INGREDIENTS CORP., a
foreign profit corporation,

      *Defendant*.

_____/

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, SABA INTERNATIONAL CORPORATION ("SABA" or "Plaintiff"), a Florida profit corporation, by and through the undersigned counsel, hereby sues Defendant, KRAFT HEINZ INGREDIENTS CORP., a foreign profit corporation ("KRAFT" or "Defendant"), and alleges as follows:

### JURISDICTION, PARTIES, AND VENUE

1.    This is an action for damages exceeding $30,000.00, exclusive of interest, attorneys' fees and costs.

2.    Plaintiff, SABA, is a Florida profit corporation with its principal place of business located in Miami-Dade County, Florida.

3.    Defendant, KRAFT, is a foreign profit corporation, with its principal place of business located in Pittsburgh, Pennsylvania.

4.    Jurisdiction in this Court is proper pursuant to Florida Statute § 26.012.

5.    Venue is proper in Miami-Dade County, Florida, pursuant to Florida Statutes §§ 47.051 and 48.193, as KRAFT operates, conducts, engages in, or carries on a business or business venture in this state, and/or committed a tortious act within this state, resulting in damages to Plaintiff in Miami-Dade County, Florida.

6.    All conditions precedent to the Plaintiff filing this action have been performed, have occurred, or have otherwise been met, waived or satisfied.

### GENERAL ALLEGATIONS

7.    SABA is a food ingredient distribution and wholesale company.

8.      SABA specializes in providing coconut products, cheese solutions, confections and baked goods, dairy flavors, dehydrated fruits and vegetables, and other food ingredients to various countries throughout Latin America and the Caribbean.

9.      Since 1994 and up through January 2021, SABA exclusively distributed KRAFT products to certain countries in Latin America and the Caribbean.

10.      For over 25 years, SABA has cultivated and developed client relationships with its own customers in Latin America and the Caribbean.

11.      For over 25 years, SABA made decisions on behalf of its customers to specifically purchase KRAFT products in lieu of products from KRAFT's competitors; and in turn, KRAFT fulfilled those orders on behalf of SABA.

12.      KRAFT was not involved in obtaining, developing, or maintaining these customers, as they were unequivocally SABA's clients.

13.      Notably, in order to fulfill orders for SABA's clients and comply with shipping requirements, KRAFT required specific client information from SABA.

14.      At all times material hereto, KRAFT gained SABA's confidential client information through this relationship.

15.      On or about October 1, 2015, KRAFT and SABA entered into that certain International Exclusive Distributor Agreement ("Distributor Agreement") whereby KRAFT formally memorialized its agreement with SABA such that SABA agreed to, *inter alia*, act as an independent distributor to purchase KRAFT products for resale in various countries throughout Latin America and the Caribbean. A true and accurate copy of the Distributor Agreement is attached hereto as **Exhibit "A."**

16.      Pursuant to the Distributor Agreement, "for a period of five (5) years after the expiration or termination hereof, the [party who received any confidential information from the other party] agrees that such Confidential Information shall be kept confidential by the Receiving Party in the same manner that it protects its own confidential and proprietary information of like kind, but in no event shall either [p]arty exercise less than reasonable care in protecting such Confidential Information." *See* Exhibit "A" at §19.

17.      Further, according to the Distributor Agreement, "any information that a reasonable person would deem confidential or proprietary given the nature of the information and the

circumstances under which it is disclosed" would be ***deemed to be Confidential Information*** for purposes of the agreement. (**emphasis added**). *See* Exhibit "A" at §19.

18.     Based on the plain language of Section 19 of the Distributor Agreement, KRAFT knew or should have known that SABA's client list/information was and continues to remain "confidential" or "proprietary" given the nature of the client list/information and the circumstances under which the client list/information was previously provided to KRAFT.

19.     In or around December 2020, KRAFT notified SABA that KRAFT was terminating the Distributor Agreement with SABA beginning on or about January 21, 2021.

20.     As a result of KRAFT acquiring SABA's confidential and proprietary client information, subsequent to KRAFT's termination of the Distributor Agreement with SABA, KRAFT began to improperly solicit SABA's clients for its own benefit, and to the detriment of SABA.

21.     Upon information and belief, since on or about December 29, 2020, KRAFT has improperly and continuously used SABA's confidential and proprietary client information to solicit SABA's clients and tortiously interfere with SABA's advantageous business relationships, and has continued to engage in these unfair methods of competition, causing damages to SABA.

## COUNT I – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")

22.     Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

23.     KRAFT engaged in unfair methods of competition with SABA by, inter alia:

    a.  Improperly and continuously using SABA's confidential and proprietary client information to solicit SABA's clients for KRAFT's own benefit and to the detriment of SABA;

    b.  Disseminating SABA's confidential and propriety client information to third-party(ies) to improperly solicit SABA's clients for KRAFT's own benefit and to the detriment of SABA; and,

    c.  Willfully confusing and misleading SABA's clients by introducing SABA's clients, either directly or through third party(ies), to a new KRAFT distributor, to the detriment of SABA.

24.     These acts or practices are unfair or unconscionable given the means in which KRAFT obtained this confidential and proprietary client information from SABA.

25.    The unfair methods of competition committed by KRAFT resulted in damages to SABA due to SABA's clients and other reasonable consumers being presented with confusing and deceptive information from KRAFT.

26.    These unfair methods of competition proximately caused and continues to cause SABA to suffer damages.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby demands judgment against Defendant, KRAFT HEINZ INGREDIENTS CORP., for actual damages, consequential damages, pre-judgment interest, reasonable attorneys' fees and costs, and for such further relief as this Court deems just and proper.

## COUNT II – VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT ("FUTSA")

27.    Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

28.    SABA invested significant time and resources into the cultivation, development, and continued client relationship with its own customers in Latin America and the Caribbean over a 25-year period.

29.    SABA's client list had real commercial value based on maintaining its secrecy including non-public information of its clients and as such SABA's client list was confidential and proprietary information, and a trade secret.

30.    SABA took proactive steps to protect its confidential client list in order to keep the client list from being misappropriated by others.

31.    KRAFT knew of SABA's business relationships and obtained this confidential client information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

32.    KRAFT misappropriated SABA's trade secret, confidential and proprietary information, by obtaining the confidential client information over several years while engaged in its distributor relationship with SABA and thereafter solicited those clients for its own benefit and to the detriment of SABA.

33.    KRAFT's misappropriation of SABA's confidential and proprietary client information to solicit SABA's clients and interfere with SABA's advantageous business relationships has caused and continues to cause damages to SABA.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby demands judgment against Defendant, KRAFT HEINZ INGREDIENTS CORP., for actual damages,

consequential damages, pre-judgment interest, reasonable attorneys' fees and costs, and for such further relief as this Court deems just and proper.

## COUNT III – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS

34.     Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

35.     SABA has business relationships with its clients and with potential clients in certain geographic areas, such as Latin America and the Caribbean, with the likelihood of future economic benefit to SABA.

36.     KRAFT knew of SABA's business relationships and obtained this confidential client information as more fully outlined above.

37.     KRAFT intentionally and unjustifiably interfered with these business relationships by obtaining the confidential client information over several years while engaged in its distributor relationship with SABA and thereafter solicited those clients for its own benefit and to the detriment of SABA.

38.     As a result of KRAFT's intentional and unjustifiable conduct, SABA suffered and continues to suffer damages.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby demands judgment against Defendant, KRAFT HEINZ INGREDIENTS CORP., for compensatory damages, consequential damages, pre-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT IV – DECLARATORY RELIEF

39.     Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

40.     There is an actual, bona fide, present and practical need for a declaration in this matter.

41.     The declaration concerns a present, ascertained or ascertainable state of facts or present controversy as to a state of facts, to wit: KRAFT's direct competition, solicitation, and continuous use of SABA's confidential and proprietary client information for the benefit of KRAFT and to the detriment of SABA.

42.     An immunity, power, privilege, or right of SABA is dependent upon the facts or law applicable to the facts.

43. KRAFT has an actual, present, adverse, and antagonistic interest in the subject matter, either in fact or law.

44. The antagonistic and adverse interests are all before the Court by proper process.

45. The relief sought is not merely giving of legal advice or the answer to questions propounded for curiosity.

46. Consequently, SABA requests entry of a declaratory order against KRAFT stating the following:

    a. SABA's client list is deemed confidential and/or proprietary and subject to the terms of the Distributor Agreement;

    b. KRAFT must cease and desist from any further direct or third-party solicitation, advertising and/or marketing to SABA's clients for the benefit of KRAFT; and,

    c. KRAFT must return and/or destroy all confidential and proprietary client information of SABA.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby requests entry of a declaratory order against Defendant, KRAFT HEINZ INGREDIENTS CORP., for the purposes and acts specifically described herein, and for such further relief as this Court deems just and proper.

## COUNT V – TEMPORARY AND/OR PERMANENT INJUNCTIVE RELIEF

47. Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

48. In the absence of an injunction, SABA will suffer irreparable harm to SABA's goodwill and reputation, including but not limited to, lost profits, the loss of future business opportunities, potential loss of current clients, and loss of future revenue.

49. SABA has invested significant time and resources into the cultivation, development, and continued relationship with its customers, and KRAFT is improperly using this confidential and proprietary information to solicit those clients for KRAFT's own benefit and to SABA's detriment.

50. SABA has suffered irreparable harm to its business due to the actions of KRAFT.

51. The remedies available at law are inadequate to compensate SABA for the harm caused by KRAFT.

52. Considering the balance of hardships between SABA and KRAFT, a remedy in equity is warranted.

53.     The public interest would not be disserved by a permanent injunction.

54.     Unless this Court enjoins KRAFT from continuing to improperly solicit SABA's clients, tortiously interfering with SABA's business relationships, and engaging in unfair methods of competition, SABA will continue to suffer irreparable harm.

55.     Consequently, SABA seeks an injunction against KRAFT for the following:

a.   Enjoining KRAFT from contacting SABA's clients, either directly or through a third-party;

b.   Enjoining KRAFT from retaining, hiring, or engaging in any third parties to solicit and/or contact SABA's clients to purchase KRAFT's products; and,

c.   Ordering KRAFT to return and/or destroy all confidential and proprietary client information of SABA.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby requests entry of a preliminary injunction, thereafter made permanent, enjoining Defendant, KRAFT HEINZ INGREDIENTS CORP., for the purposes and acts specifically described herein, and for such further relief as this Court deems just and proper.

## COUNT VI – UNJUST ENRICHMENT

56.     In the alternative, Plaintiff reasserts and realleges paragraphs 1-21 as if fully set forth herein.

57.     SABA has business relationships with its clients and with potential clients in certain geographic areas, such as Latin America and the Caribbean, with the likelihood of future economic benefit to SABA.

58.     KRAFT knew of SABA's business relationships and obtained this confidential client information and is improperly using this confidential and proprietary information to solicit those clients.

59.     As a result of the conduct described herein, KRAFT has been using and continues to use SABA's confidential client list for its own benefit and to SABA's detriment.

60.     As a consequence of the acts as set forth above, KRAFT was unjustly enriched at SABA's expense.

61.     In equity and good conscience, KRAFT should not be permitted to retain monies wrongfully belonging to SABA.

62.    The remedies available at law are inadequate to compensate SABA for the harm caused by KRAFT.

**WHEREFORE**, Plaintiff, SABA INTERNATIONAL CORPORATION, hereby alternatively demands judgment against Defendant, KRAFT HEINZ INGREDIENTS CORP., for the amount by which the Defendant was unjustly enriched, interest and costs, and for such further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

**VERIFICATION**

I, Elda Hoytink, President of SABA International Corporation, declare under penalty of perjury that I have reviewed the foregoing Complaint and all the factual statements herein are true and correct.

Elda Hoytink
President, SABA International Corporation

Dated this _1/7_ day of August, 2021.

Respectfully Submitted,

**TREMBLY LAW FIRM**
*Attorneys for Plaintiff*
9700 South Dixie Highway, PH 1100
Miami, Florida 33156
Telephone: (305) 431-5678
E-Mail: john@tremblylaw.com
E-Mail: service@tremblylaw.com

By: /s/ *John E. Wilking*
    **John E. Wilking, Esq.**
    Florida Bar No. 71167

# EXHIBIT A

## International Exclusive Distributor Agreement

This International Exclusive Distributor Agreement ("**Agreement**") is entered into on October 1, 2015 between **KRAFT FOOD INGREDIENTS CORP.**, with offices at 8000 Horizon Center Boulevard, Memphis, TN 38133, United States of America ("**Kraft**"), and **SABA INTERNATIONAL CORP.**, with offices at 275 Fontainebleau Boulevard, Suite 100, Miami, Florida 33172 ("**Saba**" or "**Distributor**"). (Kraft and Distributor are hereinafter referred to jointly as the "**Parties**" and individually as a "**Party**".)

WHEREAS, subject to the terms and conditions of this Agreement, Kraft wishes to engage Saba as an independent distributor to purchase Products for resale in the Territory (as such terms are defined below) and Saba wishes to accept such engagement; and

WHEREAS, Kraft and Saba are separately entering into an International Broker Agreement to define the terms and conditions that will apply to those transactions in which Saba will also solicit orders for the Products from customers in the Territory.

For good and valuable consideration, including the mutual obligations set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  APPOINTMENT AND TERM

    A.  Kraft hereby appoints Distributor as an exclusive independent distributor, for sales of Kraft product categories identified in Schedule A hereto ("**Products**") in Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica and Panama (collectively, "**Territory**"), for a period of one (1) year beginning on the date both Parties have signed this Agreement (the "**Effective Date**"). Notwithstanding the foregoing, and for the avoidance of doubt, Kraft will discourage, but cannot and will not prevent, third party distributors and other third parties from selling Kraft products, including the Products, in and into the Territory and Kraft shall not be responsible to Distributor for any Products shipped by third parties into the Territory. Kraft is entitled to discontinue, modify, or substitute any of the Products, and modify Schedule A, at any time in its sole discretion. Also notwithstanding the foregoing, Distributor's exclusive distributor appointment shall not include, and Kraft expressly reserves for itself the right to make, sales of the following skus by Kraft directly to Quaker Oats' external manufacturer in Guatemala, Alimentos SA: PN 6006996911500 40# MM Bit Choc 1/4X1/4 Cyldr; PN 6006997348100 40# Bit Quaker Safari; PN 210007387100 50# Hexagon II Colored (Cheese Powder).

    B.  Unless terminated by either Party pursuant to Section 10, this Agreement shall be automatically renewed for successive one-year terms; provided, however, that such automatic renewal shall not exceed two successive renewals without both Parties signing a renewal of the Agreement. Notwithstanding any number of renewals, this Agreement is and shall always be interpreted as a fixed-term contract and not an indefinite-term contract. The initial and all subsequent renewal term(s) will constitute separate terms.

    C.  Appointment as a distributor of Products does not imply a right to purchase or sell any other Kraft products, or to purchase from any other entity which directly or indirectly controls, is controlled by, or is under common control with Kraft.

        In July 2015, Kraft Food Ingredients Corp.'s parent company was, through a series of mergers, merged with and into H.J. Heinz Company. In connection with the merger, H.J. Heinz Company changed its name to Kraft Heinz Foods Company and became a wholly owned subsidiary of The Kraft Heinz Company. For the avoidance of doubt, this Agreement governs Distributor's appointment as a distributor for Products sold by Kraft Food Ingredients Corp., based in the United States, and does not (i) constitute an agreement with, or an appointment as a distributor by or for, any other entity under common control with Kraft Food Ingredients Corp. or controlled by The Kraft Heinz Company, or (2) confer any rights or benefits to Distributor with respect to products offered for sale by any other entity under common control with Kraft Food Ingredients Corp. or controlled by The Kraft Heinz Company. Nothing in this paragraph, however, shall limit Kraft's rights under the assignment provisions of this Agreement.

    D.  Distributor's relationship to Kraft shall be solely that of buyer and seller, and nothing contained herein shall be construed as constituting the Parties as partners or joint venturers, or as constituting Distributor or any party appointed or licensed by Distributor as a representative, employee, or agent of Kraft.

2.   **DIVERSION & RESTRICTION ON COMPETITIVE PRODUCTS**

    A.    Distributor agrees to purchase the Products exclusively from Kraft and shall not purchase any other Kraft products from resellers not authorized by Kraft. Distributor shall not engage in Diversion of the Products or any other Kraft products and shall not knowingly assist its customers or any other third parties to engage in Diversion of the Products or any other Kraft products. For purposes of this Agreement, Diversion is defined as the sale, resale, use, or disposal of any Kraft products outside of the Territory. A sale to a person located, domiciled, or with an office inside the Territory for delivery outside the Territory shall be deemed to be Diversion. A sale to a customer in the Territory with delivery of Products in the Territory shall be deemed Diversion if Distributor knows or has reason to know that the customer intends to resell the Products outside the Territory or otherwise move the Products from the Territory. Diversion by Distributor or its customers shall be grounds for immediate termination of this Agreement, at the sole discretion of Kraft. Distributor agrees to work with Kraft, in good faith, to try to stop any known or suspected Diversion by Distributor's customers. Upon Kraft's request, Distributor will promptly provide such documentation as Kraft may reasonably request in order to verify the actual country of destination for any Kraft products sold by Distributor. Such documentation may include, but shall not be limited to, on-board ocean bills of lading, shipper's export declarations, and/or evidence of customs clearance in the country of destination.

    B.    In order to ensure Distributor's best efforts to promote the Products and to prevent conflicts of interest, Distributor agrees that it will not during the term of this Agreement handle or promote within the Territory, directly or indirectly, any products similar to or in competition with the Products which Distributor is authorized to handle under Section 1 of this Agreement, without prior written approval from Kraft.

3.   **KRAFT'S COMMITMENT TO DISTRIBUTOR**

    A.    Kraft will work to create demand for the Products, through the following methods, implemented in the manner and to the extent Kraft deems reasonable:

        (1)    Product development, the purpose of which is to introduce new products that give the Distributor a competitive edge in its market.

        (2)    Any product literature provided by Kraft to Distributor will be provided in the English language. Should Distributor wish to prepare a translation of any of these materials for distribution to current or prospective customers, Distributor shall seek the prior written approval of Kraft. The cost of preparing any translations will be borne by Distributor, unless Kraft agrees otherwise in writing. Any copyright relating to such a translation shall accrue to the sole benefit of Kraft and Distributor shall assign or procure the assignment of any intellectual property rights in such translations to Kraft, at the expense of Kraft, if approved by Kraft.

        (3)    If Kraft provides funding or reimbursement for agreed-upon marketing activities, Distributor shall provide to Kraft proof of performance satisfactory to Kraft of such marketing activities for which Kraft provides funding or reimbursement.

    B.    Kraft will provide Product support by offering reasonable assistance to Distributor on technical questions and Product recommendations, at no charge.

4.   **COMMITMENTS OF DISTRIBUTOR**

    A.    Distributor agrees to use its utmost diligence and best efforts at its own expense to actively market and promote the Products in the Territory, and not to contradict Kraft's marketing efforts or in any other way or place the Products in an uncompetitive position.

B.     Distributor agrees to keep inventory in a secure environment and the Products in quantities sufficient to promptly serve customers from stock. Distributor agrees at Kraft's request to provide inventory level documentation and to allow the examination of its inventory at any reasonable time.

C.     When requested by Kraft, Distributor agrees to provide Kraft a non-binding forecast concerning its purchases of Products.

D.     Distributor agrees to hold Kraft sales meetings at the Distributor's premises for the purpose of training appropriate Distributor personnel in the Products on an as-needed basis.

E.     Distributor agrees to maintain or compile accurate records, documentation, or information concerning its activities carried out pursuant to this Agreement; provided, however, that this requirement does not require Distributor to provide customer or price lists. Such records shall include, but not be limited to, records connected to the purchase of the Products from Kraft, such as bills of lading, customs clearance documents, warehousing receiving reports, and such other documents that help corroborate that the Products were imported into and sold in the Territory. Such records shall be maintained by Distributor for a period of six (6) years from their creation. Distributor shall provide copies of such records to Kraft upon request, in which case all reasonable expenses shall be borne by Kraft, or shall make such records available for review by Kraft at the place or places where such records are regularly maintained, during regular business days and hours.

F.     Distributor will advise Kraft regarding any information of a competitive, market or, product nature that may have an effect on Kraft's market position, of which it becomes aware; provided, however, that the foregoing does not require Distributor to reveal any confidential information that Distributor is obligated, by a contract with another party, to keep confidential, or information which, if divulged to Kraft would, violate any applicable law.

G.     Distributor will inform customers of Kraft's policies, where applicable, including, but not limited to, policies regarding Diversion, Anti-Bribery and Corruption, and Product returns, provided that the aforementioned policies shall be provided by Kraft to Distributor in advance.

5.    <u>ORDERS</u>

A.     Each sale of Products to Distributor shall be governed by and shall be deemed to incorporate the terms and conditions of this Agreement.

B.     Distributor shall make firm offers to purchase Products by issuance of a purchase order delivered to Kraft via e-mail or facsimile. Kraft may accept and shall be deemed to accept Distributor's offer by issuing a purchase order acceptance, commencing performance, or shipping any Product (whichever occurs first). Kraft reserves the right to accept or refuse Distributor's purchase order for Products in whole or in part at its sole discretion, provided, that, it shall notify Distributor of such acceptance or refusal within five (5) U.S. business days from the day of the receipt of such purchase order. Kraft also reserves the right to limit order quantities by giving Distributor reasonable prior written notice, when possible.

C.     Kraft invoices bear date of shipment and are sent to Distributor on or about the business day of shipment. Distributor's failure to comply with payment terms on the invoices, which Distributor failed to remedy non-payment within thirty (30) calendar days after being called upon in writing by Kraft to do so in accordance with Section 10.D hereof, may result in termination, at Kraft's discretion.

6.    <u>PRICE/DELIVERY TERMS</u>

A.     Distributor's price for purchasing each of the Products shall be based on: (i) a Distributor price list published by Kraft from time to time with respect to those Products priced based on Distributor price list, and (ii) contract pricing agreed upon between Distributor and Kraft from time to time for the remainder of the Products (provided however that if at any time Distributor and Kraft are unable to agree on contract pricing for contract pricing-based Products, then pricing for such Products will be based on Distributor price list). Distributor shall be entitled to a five percent (5%) discount off the respective current Distributor price list pricing and contract pricing for the

3

relevant Products. Kraft's published Distributor price list prices are subject to change by Kraft at its discretion from time to time. Kraft shall be entitled to accept orders and bill in accordance with current negotiated prices for Distributor, net of the aforementioned 5% discount, even where incorrect prices, discounts, or terms may appear on Distributor's purchase order. All amounts payable by Distributor to Kraft under this Agreement are exclusive of any taxes, levies, or similar governmental charges that may be assessed by any government. If, under the laws of the Territory, Distributor is required to withhold any tax on such payments, then the amount of the payment shall be automatically increased to offset such tax fully, so that the amount actually remitted to Kraft, net of all taxes, equals the amount invoiced or otherwise due.

B.      The applicable delivery term shall be negotiated by Kraft and Distributor on a case-by-case basis and stated on each purchase order. Delivery dates listed on any quotation, order confirmation report, preliminary invoice/order acknowledgement, final invoice or elsewhere are estimates only. Kraft does not guarantee that Products will be delivered on any particular date or dates but will use its best efforts to ensure that Products will be delivered on a date or dates as close as possible to the estimated delivery date or dates.

C.      Kraft may, at its option, make partial shipment, and where reasonable or customary, ship overages and underages of weight, length, size, and/or quantity. Unless Distributor requests otherwise, all Products will be packaged and packed in accordance with Kraft's standard practices. It is Distributor's obligation to notify Kraft of any special packaging or packing requirements, including any product labeling or product stickering requirements as further described in Section 16, which shall be met at Distributor's expense.

D.      Title to Products will pass to Distributor at the same point as the passage of risk of loss or damage under the applicable delivery term.

## 7.   PAYMENT/SECURITY

A.      Payment terms are sixty (60) calendar days from the date of Kraft's invoice for Products shipped via ocean freight and thirty (30) calendar days from the date of Kraft's invoice for Products shipped via air freight. Payments shall be wired to an account to be provided by Kraft.

B.      Whenever Kraft in good faith deems the risk of nonpayment or late payment by Distributor commercially unacceptable, Kraft may do one or more of the following: (i) cancel any outstanding order with Distributor, (ii) decline to accept new orders and/or fulfill pending orders; (iii) revoke any extension of credit to Distributor and require payment for all Products delivered hereunder to be supported by an irrevocable standby letter of credit issued in favor of Kraft and with terms and conditions approved by Kraft; (iv) reduce any unpaid debt by enforcing its security interest, created hereby, in all Products (and proceeds therefrom) furnished by Kraft to Distributor; and (v) take any other steps necessary or desirable to secure Kraft fully with respect to Distributor's payment for Products furnished or to be furnished by Kraft.

## 8.   INSPECTION/ACCEPTANCE/RETURN/CLAIMS

A.      In the absence of appropriate written notice sent to Kraft after Distributor's inspection of the Products, Distributor shall be conclusively deemed to have inspected and accepted the Products within five (5) business days after receipt. Any deficiency in the visible quality or quantity of the Products must be reported within five (5) business days after such deficiency is discovered during the inspection period. Distributor's claims regarding any such deficiency not discovered during the inspection period shall be barred if not reported within the reporting period.

B.      All claims (for example: for short shelf life, damaged Products, etc.) must be filed in writing with the appropriate Kraft Customer Service Specialist ("CSS"). Distributor's designated sales representative ("Sales Representative") at Kraft can provide Distributor with the name and contact information for the CSS. Distributor shall comply with the procedures and deadlines for filing claims as communicated to Distributor by CSS. If the Distributor does not comply with these procedures and deadlines, Kraft will not be responsible for processing the Distributor's claim. Products that are involved in a claim shall not be destroyed or returned unless authorized in writing by CSS or the appropriate Kraft market manager. Verbal notification of a claim by Distributor will not be

4

accepted. The CSS shall use reasonable efforts to resolve a claim and shall notify Distributor of such resolution in writing.

C.   When and if a claim is approved, CSS will issue a credit note or a corrected invoice, and may reimburse Distributor for any of its documented (in English) transportation and/or freight costs and any non-recoverable taxes, duties or levies imposed in respect of the same, as well as expenses related to the recovery of any taxes, duties or levies. If a claim is declined, CSS will notify the Distributor's representative of the reason for the decision as soon as practicable. Deductions by Distributor from Kraft invoices for any amounts Distributor believes are owed to it are not considered claims and will not be investigated or researched. Deductions are not accepted in lieu of filing a claim and they will only cause further delay in achieving resolution.

D.   Kraft will not process or accept a claim if the Distributor makes use of, sells, or otherwise disposes of the Products after the Distributor discovers that the Products are defective or damaged or that their shelf life has expired.

9.   <u>TRADEMARKS, COPYRIGHTS AND TRADE NAMES</u>

A.   Distributor agrees to affix to the Products, or not to remove if already affixed, Kraft's trademarks, trade names, copyright, and/or patent notices. All trademarks, trade names, patents, utility models, design rights and copyrights of Kraft, whether registered or not, shall remain Kraft's exclusive property. Distributor does not receive any rights in them hereunder. Distributor is not a licensor or licensee of Kraft, and Distributor agrees not to take any action which would be detrimental to Kraft's ownership of these items. Distributor agrees to promptly inform Kraft, in writing, of any suspected infringements to which Distributor is aware, but no registration or other legal proceeding concerning trademarks, trade names, utility models, design rights, copyrights or patents shall be taken without Kraft's written consent.

B.   Distributor must obtain written permission from Kraft prior to any other usage of any Kraft trademarks, trade names or copyrighted material, including the Kraft name and corporate logo, or any mark, name or logo likely to create confusion therewith, for any purpose. The request for permission must include final copy, layout and form of the intended use before approval will be granted.

C.   Distributor shall not adopt or use, without Kraft's prior written consent (such consent not to be unreasonably withheld), any word or mark that is likely to be confusingly similar to Kraft's trademarks depicted on the Products, or confusingly similar to any other trademarks or service marks owned by Kraft. Distributor shall not use the trademarks depicted on the Products in such a manner as to deceive the public or in a manner that is disparaging to the Products or to Kraft's rights therein.

10.   <u>TERMINATION</u>

A.   Subject to the limitation on successive automatic renewals specified in Section 1, this Agreement has an automatically renewable one-year term, unless one Party gives written notice of non-renewal at least sixty (60) calendar days prior to the end of the first year or any one-year renewal year. Distributor or Kraft may also terminate this Agreement at any time, without cause, upon ninety (90) calendar days' written notice to the other Party.

B.   Either Party may terminate this Agreement (i) immediately upon the institution by or against the other Party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the other Party's debts, (ii) immediately upon the other Party making an assignment for the benefit of creditors, (iii) immediately upon the other Party being dissolved or otherwise ceasing to do business (iv) immediately upon any change in the control of the other Party, except for any change in control described in Section 26 hereof, or (v) prior to the effective date of any new or revised law or regulation in the Territory which would prevent termination of this Agreement in accordance with its terms.

C.   Kraft may terminate this Agreement immediately on notice to Distributor if Kraft reasonably believes that Distributor has breached or will breach any obligation, representation, warranty, or covenant contained in Section

14.  In the case of termination pursuant to this Section, Distributor shall not be entitled to any compensation, statutory or otherwise, otherwise due from Kraft upon termination.

D.      Except as stated as Section 10.C, if either Party fails to fulfill its duties under this Agreement or if one Party breaches a term or condition of this Agreement, the non-breaching Party may give written notice of the breach to the breaching Party and require that the breaching Party correct the breach within thirty (30) calendar days.  If such a breach is not corrected within this period, the non-breaching Party may then terminate this Agreement, in accordance with its terms, by giving notice to the breaching Party with termination effective upon receipt of such notice by the breaching Party.

E.      Upon termination or non-renewal of this Agreement for any reason, in accordance with its terms, all rights granted to Distributor hereunder will immediately cease, and Distributor will promptly comply with the termination obligations specified below and otherwise cooperate with Kraft in a reasonable fashion as follows:

(1)      Distributor shall discontinue all use of Kraft's trademarks and/or trade names, shall cease to represent that it is an authorized Distributor of Kraft, and shall return to Kraft or destroy, as directed by Kraft, all Kraft marketing materials, any other items that Kraft may have provided to Distributor, and any items bearing Kraft's trademarks.  Nevertheless, Distributor shall have the right to sell its remaining inventory of Products unless Kraft elects to repurchase that inventory at a price agreed upon by the Parties, with return freight to be paid by Kraft. Kraft shall still be liable to supply the Products which are subject to any pending or outstanding accepted orders of available products which have not been supplied in full by Kraft prior to such termination or non-renewal;

(2)      Distributor shall not be entitled to and shall not claim or seek indemnification for any form of damages from Kraft by reason of such termination, nor shall Distributor be entitled to nor claim or seek from Kraft any form of compensation or damages on account of goodwill, prospective profits, investments or other disbursements made by Distributor in furtherance of this Agreement nor for any other reason whatsoever (other than Kraft's breach);

(3)      Distributor will pay Kraft all due and outstanding amounts as well as any outstanding amount that has not become due, the due date of which will be automatically accelerated to the date of expiration or termination of this Agreement;

(4)      The granting of a notice of non-renewal or termination of this Agreement by Kraft shall entitle Kraft to request from Distributor security for the payment of any order for the Products placed by Distributor during the notice period.  After notice of non-renewal or termination by either party, Distributor may not return Products to Kraft.

11.  <u>WARRANTY</u>

A.      Kraft warrants that all Products sold to Distributor are lien free and are free from defects in workmanship or material at delivery; and KRAFT MAKES NO OTHER WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY AND/OR FITNESS FOR A PARTICULAR PURPOSE.

B.      Kraft's warranties as stated above are made only to Distributor.  Distributor shall make no warranty more extensive than the warranty expressly stated above in Section 11.A unless Distributor clearly identifies that the expanded portion of the warranties is made to its customers only by Distributor and is not the responsibility of Kraft.

12.  <u>REMEDIES/NO CONSEQUENTIAL DAMAGES</u>

A.      Provided Distributor complies with the inspection, notice, and other requirements provided in Section 8, Kraft shall, at Kraft's discretion, replace or provide a credit for Products that are deficient in quality or quantity (such replacement or credit shall include reimbursement for any of Distributor's transportation and/or freight costs and any non-recoverable taxes, duties or levies imposed in respect of the same, as well as expenses related to the

recovery of any taxes, duties or levies). Subject to and without derogating from applicable law and Kraft's liability as a manufacturer, this shall be the sole remedy for Products that are deficient in quality or quantity.

B.    SUBJECT TO AND WITHOUT DEROGATING FROM APPLICABLE LAW, UNDER NO CIRCUMSTANCES WHATSOEVER SHALL KRAFT OR DISTRIBUTOR BE LIABLE TO EACH OTHER FOR ANY INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OR FOR ANY LOSS OF PROFITS, WHETHER FORESEEABLE OR UNFORESEEABLE AND WHETHER BASED UPON LOST GOODWILL, LOSS OF USE OF MONEY, WORK STOPPAGE, IMPAIRMENT OF OTHER ASSETS, OR OTHERWISE AND WHETHER ARISING OUT OF BREACH OF WARRANTY, BREACH OF CONTRACT, STRICT LIABILITY IN TORT, NEGLIGENCE, MISREPRESENTATION, OR OTHERWISE, EXCEPT ONLY IN THE CASE OF LIABILITY ARISING FROM INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 13 AND/OR LIABILITY ARISING FROM A BREACH OF SECTIONS 9 OR 19 HEREOF.

13.    <u>INDEMNIFICATION & INSURANCE</u>

A.    Distributor shall, to the fullest extent permitted by law, defend, indemnify, and hold Kraft, its officers, directors, employees, affiliates, successors, and permitted assigns, harmless from and against any and all actions, claims, damages, losses, liabilities, judgments, settlements, awards, fines, penalties, costs, or expenses (including reasonable attorneys' fees and court costs) (collectively, **"Claims"**) that relate to, arise out of, or result from Distributor's and/or any of its owners', directors', officers', employees', agents', sub-distributors' and/or contractors'(collectively, **"Associated Persons"**):

(1)    Violations of any applicable laws, rules, and/or regulations in or of the Territory or the United States, specifically including, but not limited to, the laws and regulations described in Sections 14, 16, and 17;

(2)    Actual or alleged breach of any provisions of this Agreement, including, but not limited to the sale or Diversion of Products outside the Territory;

(3)    Negligent or more culpable acts or omissions (including any recklessness or willful misconduct) in connection with performing or failing to perform its or their obligations under this Agreement; and

(4)    Inaccurate or unauthorized representations or warranties made as part of this Agreement.

This Section 13.A shall not be construed to limit or exclude any other claims or remedies that Kraft may assert under this Agreement or by law.

B.    All indemnification obligations pursuant to this Agreement shall be subject to the following provisions:

(1)    To seek indemnification, Kraft shall notify Distributor, in writing, as soon as practicable after a Claim is received;

(2)    Distributor shall have the right to assume sole conduct of the defense of any action including the employment of legal advisers reasonably satisfactory to Kraft;

(3)    So long as Distributor has agreed in writing to indemnify Kraft against the Claim, Kraft shall not settle such Claim nor admit any liability with respect to such Claim, without the prior written consent of Distributor; and

(4)    Kraft shall take all reasonable steps at the Distributor's expense to assist in its defense of such Claim.

C.    Distributor shall maintain, throughout the Term, at its expense from a carrier satisfactory to Kraft, and naming Kraft as an additional insured with respect to the coverages required under Subsections (1) and (2) below:

(1)    Commercial/comprehensive general liability insurance (including product liability and vendors' liability insurance) in a minimum amount of five million dollars ($5,000,000) combined single limit, for bodily injury

and property damage, and endorsed to provide contractual liability insurance in the amount specified above, specifically covering Distributor's obligations to indemnify Kraft;

    (2) Comprehensive automobile liability coverage for all owned, non-owned and hired vehicles with bodily injury limits of no less than $5,000,000 per accident; and

    (3) Workers' compensation coverage as required by law, including coverage for employers' liability with limits of no less than $500,000 and a waiver of subrogation in favor of Kraft.

14.    <u>COMPLIANCE WITH LAW</u>

A.    *General.* Notwithstanding any other provision in this Agreement, Distributor makes the following representations, warranties and covenants, which have induced Kraft to execute this Agreement.

B.    *Corporate Form and Authorities.* Distributor represents and warrants that:

    (1) It is a corporation validly existing and in good standing under the laws of Florida;

    (2) It has, through its legal representatives, full power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby, to the extent applicable. The legal representative signing on behalf of Distributor has full authority to act in the name and on behalf of Distributor on the date of execution of this Agreement. The execution, delivery and performance by Distributor of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized and no other corporate proceedings on the part of Distributor are necessary to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; and

    (3) It holds all valid licenses, permits, franchises and other governmental and regulatory authorizations necessary for its business.

C.    *Anti-Corruption Compliance.*

    (1) <u>FCPA and Anti-Corruption Laws.</u> Kraft is generally subject to various laws relating to anti-bribery, fraud, and anti-corruption, most notably the United States Foreign Corrupt Practices Act, which is often referred to as the FCPA. If Distributor is unfamiliar with the FCPA, Distributor should review *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, a joint publication of the United States Department of Justice and Securities and Exchange Commission. A copy is available at the link: http://www.justice.gov/criminal/fraud/fcpa/guide.pdf. Further, the full text of the FCPA, in various languages, is available through the link: http://www.justice.gov/criminal/fraud/fcpa/statutes/regulations.html. Kraft is committed to compliance with its own standards of conduct, as well as with the laws governing its operations. As part of this commitment, it is critically important to Kraft that Distributor agree to certain covenants, and agree that Kraft may obtain certain remedies in the event of Distributor's non-compliance with these standards and laws, as set forth in this Agreement generally and this Section 14.C specifically.

    (2) <u>Covenants.</u> Distributor makes the following covenants:

       (i) Distributor, including any of Distributor's Associated Persons (as defined in Section 13.A) will not, directly or indirectly, in connection with this Agreement, pay, offer, promise to pay or authorize the payment of anything of value – which includes money, gifts, political contributions, entertainment and donations – to a Government Official for the purpose of influencing any act or decision in order to corruptly obtain or retain business or an unfair advantage. **"Government Official"** includes officials, employees, and others acting in an official capacity for or on behalf of a government, state-owned business, political party or candidate, or public international organization;

8

(ii) Distributor will ensure that all information and documents provided to Kraft in connection with Kraft's third party due diligence process, including answers provided on Kraft's Due Diligence Questionnaire, are complete, and to the best of Distributor's knowledge, truthful and accurate. Distributor will immediately notify Kraft if the information and answers change during the term of this Agreement.

(iii) Distributor, including any Associated Persons, will not take any other action that violates applicable laws that prohibit bribery, kickbacks, or other unlawful means of conducting business (e.g. UK Bribery Act, Canada Corruption of Foreign Public Officials Act, or such laws of the Territory);

(iv) Neither Distributor nor, to the best of its knowledge, any Associated Person has been convicted of or pled guilty to a crime involving fraud or corruption in the past five (5) years and Distributor will immediately notify Kraft if this should change during the term of this Agreement;

(v) Distributor will ensure that all documents prepared, approved or executed in connection with this Agreement, including documentation related to any funds spent on behalf of Kraft or its Products in connection with this Agreement, are complete, truthful and accurate. Except as otherwise stated in this Agreement, Distributor will maintain these documents for at least five (5) years after the expiration or termination of this Agreement; and

(vi) Distributor has and will maintain policies and procedures that are consistent with this Section 14.C, and will ensure that Distributor and all Associated Persons comply with such policies and procedures during the term of this Agreement.

(3) <u>Suspension</u>. Kraft may suspend performance under this Agreement immediately on notice if it reasonably believes that Distributor has breached any covenant contained in this Section 14.C. Kraft may suspend such performance until such time as Kraft is satisfied that no breach has occurred or is likely to occur.

(4) <u>Reviews</u>. During the term of this Agreement, Distributor will cooperate with Kraft in the event Kraft has a reasonable basis to suspect that a violation of this Section 14.C may have occurred, is occurring, or is likely to occur in the future. For five (5) years after the term of this Agreement, Distributor will cooperate with Kraft in the event Kraft has a reasonable basis to suspect that a violation of this Section 14.C may have occurred during the term of this Agreement. This cooperation includes providing Kraft or its third party representative with access to Distributor's records and Associated Persons. All Confidential Information provided to Kraft or its third party representatives will be protected under Section 19 of this Agreement, except for any violations of this Section 14.C discovered during the course of the review. Kraft will pay its own costs in connection with its review of Distributor, unless Kraft learns of any breaches of this Section 14.C during the review, in which case Distributor will reimburse Kraft for all costs of the review.

D. *Compliance with Other Laws.*

(1) <u>General</u>. In connection with the performance of this Agreement, Distributor covenants and agrees that neither Distributor nor, to its best knowledge, its Associated Persons will take any action that will cause it, any of its Associated Persons, or Kraft to violate any applicable law (including without limitation the laws of the United States or the Territory.

(2) <u>Payments Received</u>. Distributor represents and warrants that neither it nor, to its best knowledge, any of its Associated Persons (nor any person acting on behalf of any of the foregoing) knows or has any reason to know that Distributor, as a result of transactions under this Agreement will be in possession of proceeds, funds or assets derived from, or related to, violation of applicable laws of the United States or the Territory, and Distributor covenants and agrees that it will not, as a result of transactions made under this Agreement be in possession of proceeds, funds or assets derived from, or related to, violation of applicable laws of the United States or the Territory.

(3)    <u>Export Controls and Trade and Economic Sanctions</u>.

    (i)    Distributor represents and warrants its understanding that:

        (a)    Any Products, software, or technology, including technical data, it receives from Kraft (collectively, the **"Supplied Items"**) may be subject to the jurisdiction of the export controls and trade or economic sanctions of the United States and that U.S. export controls and U.S. trade or economic sanctions apply extraterritorially; and

        (b)    Information concerning U.S. export controls and U.S. trade or economic sanctions are, without limitation, available at the websites of the relevant U.S. governmental authorities, the U.S. Department of Commerce's Bureau of Industry and Security (**"BIS"**) (http://www.bis.doc.gov/), and the U.S. Department of the Treasury's Office of Foreign Assets Control (**"OFAC"**) (http://www.treasury.gov/ofac).

    (ii)    Distributor covenants and agrees to comply with U.S. export controls and U.S. trade or economic sanctions. Without limiting the foregoing commitment, Distributor covenants and agrees:

        (a)    Not to export, re-export, resell, release, or otherwise transfer, in violation of U.S. law, any Supplied Item to any country subject to U.S. export restrictions or trade sanctions; and

        (b)    To export, re-export, resell, release, or otherwise transfer any Supplied Item to another party only after receiving from such party a representation concerning its awareness of the possible application of U.S. export controls and U.S. trade or economic sanctions and a covenant concerning its compliance therewith regarding its use, export, re-export, resale, release, or other transfer of any Supplied Item.

(4)    <u>Antiboycott Law</u>. Distributor covenants and agrees that in its purchase, use, export, re-export, resale, or other transfer of the Supplied Items it will not cause Kraft to violate or lose tax benefits under U.S. antiboycott laws and regulations, specifically Part 760 of the Export Administration Regulations and Section 999 of the Internal Revenue Code and corresponding guidelines of the U.S. Department of the Treasury. Distributor covenants and agrees that no document relating to its purchase, use, export, re-export, resale, or other transfer of the Supplied Items will contain provisions reflecting participation in or cooperation with a foreign boycott that is not sanctioned by the United States, including without limitation the Arab League boycott of Israel.

(5)    <u>Restricted Parties</u>. Distributor covenants and agrees that in performing this Agreement it will not engage in transactions with any party listed as a specially designated terrorist, Specially Designated National, and/or Blocked Person or party which otherwise appears on any list maintained by OFAC (including, without limitation, the list of "Specially Designated Nationals and Blocked Persons" accessible through the internet website www.treas.gov/ofac/t11sdn.pdf or any successor list(s)), by BIS (www.bis.doc.gov), or by the U.S. Department of State (www.state.gov/t/isn/c15231.htm) (collectively, the **"Restricted Parties Lists"**). The Distributor represents and warrants that it is not now, and covenants and agrees that it will not engage in any actions that would cause it to become, a party listed on any of the Restricted Parties Lists.

## 15.    <u>CUSTOMS COMPLIANCE</u>

    A.    At the time Distributor places an order for Products, Distributor must advise its Supply Chain Coordinator at Kraft in writing of all the customs documentation requirements by Product required to import and sell the Products into the Territory. Kraft will review the information provided by Distributor (i) to ensure that Kraft can provide the customs documentation Distributor is requesting; and (ii) to determine, to Kraft's own satisfaction, whether the customs documentation requirements identified by Distributor are correct. If Kraft reasonably concludes that the customs documentation requirements in the Territory identified by Distributor are deficient for any reason, Kraft will contact Distributor promptly to advise Distributor of the discrepancy and Distributor will be responsible for

reviewing and verifying to Kraft's satisfaction the customs documentation requirements to import the Products into the Territory. Regardless of any research or other investigation undertaken by Kraft as noted above, it is the Distributor's responsibility to ensure that all Products comply with all applicable customs regulations in the Territory.

B.    Additionally, if there are specific customs regulations in the Territory relative to product formulation requirements, species restrictions based on country of origin (such as bans on the importation of beef), or other types of requirements, Distributor will promptly advise Kraft in writing. Kraft may, with the assistance of Distributor, take steps to determine, to Kraft's own satisfaction, whether the Product meets the identified requirements for the Territory. If Distributor or Kraft concludes that the Product is not able to meet the identified customs requirements, Distributor acknowledges and agrees that such Product will not be imported into or offered for resale in the Territory. Regardless of any research or other investigation undertaken by Kraft as noted above, it is the Distributor's responsibility to ensure that all Products comply with all applicable customs regulations in the Territory.

16.    LABELING COMPLIANCE/PRODUCT STICKERING

A.    *Product Formulation and Labeling Compliance.* Distributor agrees to assume complete and exclusive responsibility for compliance with all Product formulation requirements, labeling requirements, and any other applicable standards or regulations in effect in the Territory.

B.    *Product Stickering.* Wherever it becomes necessary to affix a sticker to the Products in order to comply with the labeling laws and regulations of the Territory, Distributor will prepare (at Distributor's sole cost and expense) the label copy for the stickers that will be affixed to all the Products being imported by Distributor into the Territory. Distributor must submit one copy of each sticker to its designated Sales Representative at Kraft for reference within a reasonable time (but no later than thirty (30) calendar days from the date the sticker is completed). Kraft may conduct a trade check of the stickered Products in the Territory, from time to time in its discretion. Should there be a need for changes to the stickers (resulting from changes to the product formulation or changes in local laws, for example), Distributor will provide a copy of each new sticker to its designated Sales Representative at Kraft for reference within a reasonable time (but no later than thirty (30) calendar days from the date the new sticker is completed) along with a written explanation of the reasons that necessitated the change.

C.    *Audits and Requests for Changes to Process.* Kraft may audit Distributor's product stickering process and require Distributor to make changes in content or process. These requests for changes will be communicated by the Sales Representative to Distributor in writing along with an explanation of the reasons necessitating the change. Distributor must effect such change(s) within thirty (30) calendar days of the date of Kraft's written communication to Distributor.

17.    SANITARY & HEALTH REGISTRATIONS/OTHER DOCUMENTS

Wherever the laws and regulations of the Territory require the Products to be registered with the local health or sanitary authorities, Distributor agrees to assume complete and exclusive responsibility for properly obtaining and maintaining in full force and effect all sanitary or health registrations for the Products in the Territory at Distributor's sole cost and expense. At the time Distributor places an order for the Products, Distributor must notify its designated Sales Representative at Kraft of the documentation needed from Kraft to support Distributor's registration of the Products. Distributor must submit to its designated Sales Representative at Kraft a copy of the sanitary or health registrations before the Products are imported into the Territory. Distributor agrees that all such sanitary or health registrations will name the appropriate Kraft legal entity as the owner of such registrations, or if not permissible under the law of the Territory, Distributor agrees that such sanitary or health registrations will be for the sole and exclusive benefit of Kraft.

18.    PRODUCT RECALLS AND/OR MARKET WITHDRAWALS

In the event of any product recall and/or market withdrawal in any Territory, Distributor will immediately and fully comply with Kraft's written instructions to recall or withdraw Products from the trade and consumers, and provide assistance to Kraft, including but not limited to, overtime work, hiring extra personnel, and contracting with the required independent

services. Distributor agrees to notify Kraft immediately in the event any Products are found to have violated, whether in Distributor's personal knowledge, or by notice from any competent authority in the United States or the Territory, or reasonably be suspected to have violated, any applicable laws, whereupon Kraft may direct Distributor to conduct a Product recall and/or market withdrawal. Kraft will reimburse Distributor for the reasonable and documented costs incurred in the Product recall and/or market withdrawal effort, except where any product recall or market withdrawal results from either of the following by Distributor or any Associated Person: (i) negligence or willful misconduct; or (ii) actual or suspected violation of any applicable laws.

19.    CONFIDENTIALITY

During the term of this Agreement, either Party (each a **"Disclosing Party"**) may disclose certain Confidential Information (as defined below) to the other Party (each a **"Receiving Party"**) to permit the Receiving Party to perform its obligations under this Agreement. The Receiving Party shall refrain from using any and all Confidential Information for any purposes or activities other than those expressly authorized in this Agreement. During the term of this Agreement and for a period of five (5) years after the expiration or termination hereof, the Receiving Party agrees that such Confidential Information shall be kept confidential by the Receiving Party in the same manner that it protects its own confidential and proprietary information of like kind, but in no event shall either Party exercise less than reasonable care in protecting such Confidential Information. The Receiving Party (i) may disclose Confidential Information to its employees, advisors, representatives, and other agents (**"Employees and Agents"**) only to the extent such Employees and Agents have a need to know Confidential Information for purposes related to this Agreement, and (ii) shall implement appropriate security measures in order to prevent its Employees and Agents from disclosing or misappropriating any Confidential Information they obtain access to.

Confidential Information means all confidential and proprietary information of a Disclosing Party disclosed to a Receiving Party, whether orally, visually, in writing, or in any other recorded or tangible form, that is either marked or designated as confidential or proprietary or is identified in writing as such within fifteen (15) days of disclosure to the Receiving Party, *provided that* the following information shall be deemed to be Confidential Information even if not so marked or identified: the terms and conditions of this Agreement (including pricing and other terms reflected in the schedules hereto); the Disclosing Party's business and marketing plans, technology and technical information, product designs and processes; and any information that a reasonable person would deem confidential or proprietary given the nature of the information and the circumstances under which it is disclosed. Confidential Information does not include any items of information which: (i) is or becomes available in the public domain without the fault of the Receiving Party; (ii) is disclosed or made available to the Receiving Party by a third party without restriction and without breach of any relationship of confidentiality; (iii) is independently developed by the Receiving Party without access to the Disclosing Party's Confidential Information; and (iv) information that was known or otherwise available to the Receiving Party at the time of disclosure by the Disclosing Party without breach of confidence.

Upon the termination or expiration of this Agreement, or upon the request of a Disclosing Party, the Receiving Party shall return to the Disclosing Party, or shall destroy, as the Disclosing Party shall specify, all copies of all the Disclosing Party's Confidential Information in the Receiving Party's possession and, if requested by the Disclosing Party, shall provide the Disclosing Party with a certificate executed by an authorized representative of the Receiving Party, confirming that all copies of the Disclosing Party's Confidential Information have been returned to the Disclosing Party or destroyed, as the case may be.

20.    APPLICABLE LAW AND DISPUTE RESOLUTION

A.    This Agreement, all transactions herein, and the legal relations between the parties will be governed and construed solely in accordance with the laws of the State of Delaware without regard to its conflicts of law rules. The provisions of the 1980 UN Convention on Contracts for the International Sale of Goods, as amended, shall not apply to this Agreement or the transactions contemplated herein.

B.    The Parties agree to resolve any dispute relating to this Agreement exclusively in the U.S. District Court for the Northern District of Illinois, and each of Party irrevocably submits to the sole and exclusive jurisdiction of this court to hear any such dispute.

21. <u>FORCE MAJEURE</u>

Except for payment due Kraft from Distributor, any obligations of the Parties shall be excused during the event of *force majeure* including, but not limited to, strikes, lockouts, labor disputes, acts of God, war, civil commotion, fire, flood, earthquake, embargo, acts of the public enemy, or acts of any U.S. or foreign government with jurisdiction over either Party.

22. <u>INVALIDITY AND WAIVER</u>

A.   If any clause of this Agreement is found to be either invalid or unenforceable, then such clause shall be modified to create a valid and enforceable clause which comes closest in economic effect to that intended by the Parties with the original clause.

B.   Any failure to enforce any part of this Agreement shall not constitute a waiver of that or any other part of this Agreement.

23. <u>LANGUAGE</u>

This Agreement is concluded in the English language.  Any translation of the Agreement is done solely for the convenience of the Parties, and only the English language version controls.

24. <u>AMENDMENTS</u>

This Agreement may be modified by a writing signed by the Parties.

25. <u>COMPLETE AGREEMENT</u>

Upon the Effective Date, this Agreement supersedes and replaces in their entirety all prior agreements, arrangements, commitments and understandings, whether written or oral, with respect to the subject matter hereof, including but not limited to that April 14, 2003 Amendment to the Parties' Letter Agreement dated October, 2001.  Distributor agrees that it has not relied on any representation, warranties, or promises not explicitly stated in this Agreement, that no oral statement has been made to it that in any way tends to modify or waive any of the terms and conditions of this Agreement, and that this Agreement constitutes the final written expression of all terms of the Agreement and is a complete and exclusive statement of those terms. No additional or different provisions in Distributor's purchase orders or other standard business forms shall be binding upon Kraft unless specifically agreed to by Kraft, in writing.

26. <u>ASSIGNMENT</u>

This Agreement and the rights and obligations hereunder may not be assigned, delegated, or transferred by either Party without the prior written consent of the other Party; provided, however, that Distributor's consent shall not be required with respect to any assignment, delegation, or transfer by Kraft to (i) any person that acquires the business to which this Agreement relates, or (ii) a person controlled by or under common control with Kraft.

27. <u>NOTICES</u>

All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by internationally recognized express courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of successful transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Party).

If to Kraft:          Kraft Food Ingredients Corp.
                      8000 Horizon Center Blvd.
                      Memphis, TN 38133 USA

                                  Attention: Federico Noltenius
                                  Email: fnoltenius@kraftheinzcompany.com
                                  Phone: 305-964-5983

Copy to:               Kraft Heinz Foods Company
                                  Three Lakes Drive
                                  Northfield, IL 60093 USA
                                  Attention: Chief Counsel, Exports, Food Service & Antitrust
                                  Email: laura.guillen@kraftheinzcompany.com
                                  Phone: 847-646-7589

If to Distributor:      Saba International Corp.
                                  275 Fontainebleau Boulevard, Suite 100
                                  Miami, Florida 33172
                                  Elda Hoytink -- President
                                  elda@sabaintl.us
                                  Tel: 305-220-4335

Either Party may change its mailing address and contact information by written notice to the other Party in accordance with this Section 27.

28.     SURVIVAL

The following provisions shall expressly survive the termination or expiration of this Agreement for any reason: Section 7 (Payment/Security); Section 9 (Trademarks, Copyrights, and Trade Names); Section 10 (Termination); Section 11 (Warranty); Section 12 (Remedies/No Consequential Damages); Section 13 (Indemnification and Insurance); Section 14 (Compliance with Law); Section 18 (Product Recalls and/or Market Withdrawals); Section 19 (Confidentiality); Section 20 (Applicable Law and Dispute Resolution); and Section 25 (Complete Agreement); Section 27 (Notices).  Any additional provisions, promises, representations and warranties contained in this Agreement which, by their nature and effect, are required or intended to be observed, kept, or performed after the expiration or earlier termination of this Agreement shall also survive such expiration or termination and remain binding upon the Parties.

29.     COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or e-mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by facsimile or e-mail shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of the Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the day and year set forth below.

KRAFT FOOD INGREDIENTS CORP.

By: _____

Name: Greg Lively

Title: VP, Sales

Date: 10/1/15

SABA INTERNATIONAL CORP.

By: _____

Name: Elda Hoytink

Title: President

Date: 10-27/2015

## Schedule A
## Product Categories

Cheese Flavors/Powders

Confectionery Ingredients (Marshmallows and Caramel)